## IN RE WRIGHT.

---

### PATENTS; PATENTABILITY; PROCESS.

An applicant for a patent for a process for the hardening of cast iron by adding to the molten metal on its way to the mold a powdered material, by means of a specific machine or device also invented by the applicant, and for which he has filed a separate application for a patent, is anticipated by a patent for a similar process, but which does not cover any means to make the mixture; as the applicant merely secures a better result from the use of the old process, by means of his mechanical device; and such an application is also anticipated by a patent for a process of treating molten metals, to convert, refine, and purify them, where in the patentee's description of his method and apparatus he suggests the utilization of the process of mingling powdered materials with the flowing stream of metal, and means for so doing.

No. 588. Patent Appeals. Submitted November 18, 1909. Decided December 7, 1909.

HEARING on an appeal from a decision of the Commissioner of Patents rejecting certain claims in an application for a patent.
*Affirmed.*

The facts are stated in the opinion.

*Mr. Paul Synnestvedt, Mr. Paul Carpenter, Mr. Charles C. Linthicum,* and *Mr. James C. Bradley* for the appellant.

*Mr. Webster S. Ruckman* for the Commissioner of Patents.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

The appellant, Frank G. Wright, filed his application for a patent for new and useful improvements in the process for introducing modifying elements into castings.

The original claims were reduced and changed into the three following:

"1. The process of introducing a modifying element into a cast body during pouring into the molds, which consists in forcing the element, in the form of a powder, by fluid pressure into a stream of heated metal intermediate the ladle and the mold."

"2. A process for introducing a modifying element into a cast body during pouring, which consists in forcing the element, in the form of a powder, by fluid pressure into the stream of metal in the direction of travel of such metal."

"3. The process of introducing a modifying element into a cast body during pouring into the molds, which consists of directing a blast of air containing the element, in the form of a powder, in a downward direction into the stream of heated metal as it enters the mold."

The alleged objects as described are "to provide a process whereby the element introduced is thoroughly disseminated throughout the mass of the casting, to the end that uniformity of product is secured; to provide a process whereby the quantity

of modifying element introduced into the body of the casting may be accurately gauged and regulated: and to provide a process whereby the mixing is accomplished conveniently and expeditously during the pouring of the casting."

One form of apparatus is described whereby the process may be carried out, and a drawing of the same is given. This, he says, "may be conveniently employed for mixing the powder with the compressed air, and forcing it through the heated metal as it is being poured." This drawing shows a ladle, from an opening in which the liquid metal flows into the mold. The compressed air flows through a pipe having a turned-down outlet or spout, carrying the powdered material into the stream of metal as it falls. A valve in the pipe regulates the force with which the powdered material may be directed, and governs the quantity of the material introduced, and secures an even distribution. He then proceeds with a description of the purpose and result of his process, which will be quoted later.

The Patent Office allowed the third of the foregoing claims and rejected the other two, and from that rejection this appeal has been prosecuted.

The rejections of claims 1 and 2 were founded on references to the prior art as disclosed in an expired patent issued to Wilmington, December 4, 1883, No. 289,741, and another to Samuel, February 16, 1883, No. 336,439. Wilmington's patent is for a method of casting car wheels, in which powdered material is placed gradually in the current of metal flowing from the ladle into the casting mold. He says: "In carrying out my invention I take in a pouring ladle a sufficient quantity of iron to pour a car wheel weighing about 550 pounds, and pour it into the mold in the ordinary manner of casting car wheels, with the exception or addition of the following process: When the mold is about three fourths filled with molten iron, and while the metal is flowing, I commence to place gradually into the current of molten iron flowing from the pouring ladle (or in the receiving basin) about a pound of finely powdered ferromanganese or its equivalent, allowing the same to be melted by its particles being in

contact and intermingling with the hotter and continuous stream of molten iron falling into the basin during the last of the filling of the mold. The continuous flow of molten iron into the basin will carry with it into the mold the ferromanganese or its equivalent, which will be disseminated in the molten iron forming the hub and plate portions of the wheel."

The appellant's description points out that his process is particularly advantageous in casting car wheels, through which, by allowing the metal to run untreated for a time into the mold, the general portion of which remains soft and tough, and then treating with the powder the metal which forms the rim, in order to render it harder. This has been emphasized, on the argument, as the particular advantage of the process claimed.

It is contended by the appellant that the mingling of the powder in the Wilmington process is by hand, and therefore impracticable, as the operator could not stand close enough to the flowing current of molten metal to accomplish the mixing, and, further, because the quantity cannot be graduated as in appellant's method.

Wilmington does not say that the mixture is to be accomplished by hand, but it is true that he points out no apparatus or device by which it may be. It does not follow, therefore, that his is necessarily a hand method, but this is immaterial. "A process is a mode of treatment of certain materials to produce a given result. It is an act or series of acts performed upon the subject-matter to be transformed and reduced to a different state or thing." *Cochrane* v. *Deener,* 94 U. S. 780–787, 24 L. ed. 139, 141; *Risdon Iron & Locomotive Works* v. *Medart,* 158 U. S. 68–75, 39 L. ed. 899, 902, 15 Sup. Ct. Rep. 745.

The result particularly desired by Wilmington was the extra hardening of cast-iron car wheels in certain parts, and he discovered that this result could be accomplished by incorporating the powdered hardening material in the stream of molten metal as it flows from the ladle into the mold. He might have indicated some device or apparatus for the accomplishing of this mixture, but it was not necessary to do so. "That a process may be patentable, irrespective of the particular form of the instrumen-

talities used, cannot be disputed. If one of the steps of a process be that a certain substance is to be reduced to a powder, it may not be at all material what instrumentality or machinery is used to effect that object, whether a hammer, a pestle and mortar, or a mill. Either may be pointed out; but if the patent is not confined to that particular tool or machine, the use of the others would be an infringement, the general process being the same. * * * The machinery pointed out as suitable to perform the process may or may not be new or patentable; whilst the process itself may be altogether new and produce an entirely new result. The process requires that certain things should be done with certain substances and in a certain order; but the tools to be used in doing this may be of secondary consequence." *Cochrane* v. *Deener,* supra. See also *Marchand* v. *Emken,* 132 U. S. 195–199, 33 L. ed. 332–334, 10 Sup. Ct. Rep. 65. In the language of Mr. Justice Grier: A new process is usually the result of discovery; a machine of invention. * * * One may discover a new and useful improvement in the process of tanning, dyeing, etc., irrespective of any particular form of machinery or mechanical device. And another may invent a labor-saving machine by which this operation or process may be performed, and each may be entitled to his patent. * * * It is when the term "process" is used to represent the means or method of producing a result that it is patentable, and it will include all methods or means which are not effected by mechanism or mechanical combinations. But the term "process" is often used in a more vague sense, in which it cannot be the subject of a patent. Thus, we say that a board is undergoing the process of being planed, grain of being ground, iron of being hammered or rolled. Here the term is used subjectively or passively as applied to the material operated on, and not to the method or mode of producing that operation, which is by mechanical means and the use of a machine, as distinguished from a process. In this use of the term, it represents the function of a machine, or the effect produced by it on the material subjected to the action of the machine. But it is well settled that a man cannot have a patent for the function or abstract effect

of a machine, but only for the machine 'which produces it."
*Corning* v. *Burden,* 15 How. 252–267, 14 L. ed. 683–690;
*Risdon Iron & Locomotive Works* v. *Medart,* 158 U. S. 68–78,
39 L. ed. 899–903, 15 Sup. Ct. Rep. 745.

The process of the appellant, like that of Wilmington, is for
the hardening of cast iron by a process of adding to the metal,
on its way to the mold, a powdered material which, when thus
incorporated therein, produces the result. No particular pro-
portion between the metal and the produced material added there-
unto is pointed out by either. Wilmington indicates no machine
or device by which the mixture is made. The appellant does.
His improvement, therefore, consists in the effect, in other
words, of the function of his machine. He says: "It has here-
tofore been common to introduce modifying elements into molds,
and also to supply such elements in the form of powder to the
metal as it is poured, but, in so far as I am aware, no means
has been provided for forcing the powder into and through the
heated metal. My process, which is an embodiment of the
latter idea, constitutes an improvement on the old methods
above indicated, and consists substantially in forcing the pow-
der through the metal as it is being poured, by means of air
pressure. This secures an intimate mixture and prevents any
uneven collection of the modifying material. It also incorpo-
rates the material instantly into the body of the heated metal,
so that it is free from the continued action of the air, as is the
case in the old methods, in which no means are provided for
getting the powder away from the surface of the heated metal."
Assuming this last assertion to be true, the process is still the
same, and the appellant merely secures a better result from
the use of the old process, by means of his mechanical device.
He has applied for a patent for his device, and it may be patent-
able as a novel means for carrying out the process, but is not an
improvement on the process itself.

It is not necessary, however, to rest the determination of the
question upon the foregoing conclusion, for it appears by refer-
ence to the Samuel patent that apparatus for supplying pow-
dered materials to flowing metal by means of an air blast is not,

itself, new. Samuel only claims a method of treating molten metals to convert, refine, or purify them, which consists in causing the metal to fall in a thin sheet through an unobstructed chamber, and directed against this sheet, as it falls, divided blasts of air or gases. This unobstructed chamber receives the metal as it comes from the ladle, and the treatment of the metal is therein, on its way to the mold, instead of in the open air, as contemplated by the appellant. It is not the claim of Samuel that anticipates, as his process relates to the refining of the molten metal by means of various gases adapted, from time to time, to the different results sought. He, however, suggests in the description of his method and apparatus, the utilization of the process of mingling powdered materials with the flowing stream. He provides rows of tuyeres that divide the blasts of air or gases in their direction against the flowing stream of metal, at several points in its progress. He says: "I prefer to combine with each set of tuyeres a device for supplying powdered metal to be blown into the molten metal through the said tuyeres intermixed with the blast, and for this purpose the rows of tuyeres are interrupted in front of the blast box, by a common mixing chamber, provided at its upper end with a valved hopper and at its lower end with a door or other device admitting of the removal of any material which may have dropped past the tuyere openings, so that, when desired, the valve may be opened and the material be allowed to drop into the chamber, where it is caught by the blasts of air and carried thereby through the tuyeres into the purifying chamber." Provision is also made, unnecessary in the open-air treatment, for a glazed opening in line with one of the rows of tuyeres, for the purpose of enabling the operator to watch the entire process without danger. Objection is made to this process, first, because the blast of air passes through the flowing stream of metal, and because, by the construction of the apparatus, the blast is directed against the stream, and not in the direction of the flow, as shown in the apparatus of the appellant. The process carried out by means of this machine, is, as we have seen, intended primarily for the purpose of purification by the gases which

cut through the metal; but it does not follow that the powdered material would necessarily be driven through the metal also. The object of using it is to incorporate it with the metal. Moreover, the appellant, in his own description heretofore quoted, speaks of "forcing the powder into and through the heated metal." As the powdered material is driven through a tuyere provided for it, by a blast of air, the force of the blast may be regulated by the ordinary valve, "whereby," as the appellant says in his description, "the force with which the powder is sent into the stream of metal may be varied." This regulation of force, as well as the direction of the blast of air which carries the powder into the metal, are improvements that would readily occur to the skilled operator of the Samuel device, who is provided with a point of observation from which he may watch the process while it is being operated. But whatever there may be in the direction of the blast of air carrying the powder, the third claim which has been allowed the appellant covers the introduction "in a downward direction into the stream of heated metal as it enters the mold."

This third claim, having been allowed, is not before us on this appeal, and we shall not discuss it.

We are clearly of the opinion that there was no error in rejecting the appealed claims, and the decision will be affirmed. It is so ordered, and that this decision be certified to the Commissioner of Patents. *Affirmed.*