# BUSCH v. JONES.

PATENTS; EQUITY JURISDICTION; INFRINGEMENT; BURDEN OF
PROOF; DAMAGES, MEASURE OF.

1. Where fifteen months before the expiration of a patent, a suit in
   equity is brought by the patentee against an alleged infringer
   for an injunction and for an accounting of damages and gains
   and profits, the expiration of the patent during the pendency
   of the suit will not oust the court of jurisdiction to decree an
   accounting, although no steps were taken by the complainant
   during the life of the patent to obtain the injunction prayed
   for in the bill of complaint.

2. Under such circumstances, at most it is within the discretion of
   the lower court upon the expiration of the patent to retain
   the cause and proceed with the accounting or to dismiss the
   bill and turn the parties over to their action at law, and the
   exercise of this discretion will not be reviewed on appeal.

3. A court of equity is not without jurisdiction to entertain a suit
   for infringement of a patent because the alleged infringer is
   not a manufacturer of the invented article but a mere user of
   one of such articles, a machine, where the patent covers a pro-
   cess as well as the machine, as it is the right of the patentee to
   have such user enjoined.

4. A claim in a patent for a machine and a process for drypressing
   folded sheets or signatures of printed matter, the process being
   described therein as "consisting of subjecting a collection of
   such sheets to pressure without the use of fuller boards, and
   while under such pressure tying them into compact bundles
   with end boards, then removing them immediately from the
   press, and allowing them to remain tied sufficiently long to fix
   and complete dry-pressing," held, not to be merely a claim for
   the function of the machine claimed in the patent, but for a
   process in the operation of which the machine is used as one
   of the essential means to produce the desired result; and the
   result being new and useful, the proper subject for a patent.

5. Unless it appears on the face of a patent that the device is without
   novelty or invention, the patent is *prima facie* evidence of its
   own validity and the burden of proving the want of novelty
   in the invention is upon the party seeking to establish that
   fact.

6. The testimony in a suit for infringement of a patent for a machine
   and process for drypressing folded sheets or signatures of

printed matter, in which the defendant claimed that the patent was void because of alleged anticipation by other patents and also because of prior public and common use, reviewed and *held* not to support such contention.

7. A claim in such a patent *held* not to be so ambiguous as to require it to be declared void, in view of the explanation by expert witnesses of its purpose and meaning.

8. Mere superficial dissimilarity in construction will not protect against infringement, but the difference must be substantial rather than formal.

9. In a suit for infringement of a patent for a machine and process for drypressing folded sheets of printed matter, where it appeared that the defendant purchased and used a single machine which infringed the complainant's patent, a decree confirming a report of the auditor was *affirmed*, where the auditor reported that there was no evidence sufficient to enable him to assess damages to the complainant by reason of the infringement, but he ascertained and reported that the defendant had realized advantages in the use of the machine and process, as savings in the cost of labor, $2,782.50, and as savings in waste of paper, $709.20; making a total saving of $3,491.70, which he reported as the gains and profits that accrued to the defendant, allowing interest on the award from the filing of the report.

No. 903. Submitted November 9, 1899. Decided February 6, 1900.

HEARING on an appeal by the defendant from a decree of the Supreme Court of the District of Columbia in a suit in equity to enjoin the infringement of a patent, and for an accounting. *Affirmed.*

The COURT in its opinion stated the case as follows:

This appeal is brought here from a final decree of the court below, passed in a cause instituted by the appellees, Joshua W. Jones and the W. O. Hickok Manufacturing Company, against Clarence M. Busch, the appellant, to have the latter restrained from further infringement of certain patents issued to the said Joshua W. Jones, and for an accounting as well for the damages suffered by the appellees as for the gains and profits derived to the appellant from the infringements of the patents. The patents were for improvements in press and process by which was effected

the pressing of folded sheets or signatures of printed matter by first subjecting them to pressure, then tying them between boards in a compact bundle and removing them from the press and allowing them to remain tied a sufficient length of time to efface the impressions produced by printing, a process known to printers and bookbinders as drypressing.

The bill was filed on the 10th of March, 1894, alleging the infringements of two patents issued to the appellee Jones, numbered respectively 204,741 and 452,898; the former dated the 11th day of June, 1878, and the latter dated May 26, 1891, both having relation to and intended to secure the exclusive right to the said Jones, as the first, original and true inventor and discoverer of certain new and useful improvements in bookbinders' drypress and sheet-tie, and of a certain new and useful process for treating folded sheets in drypressing, etc., described in said letters patent, to make, use and dispose of the appliances and process of said invention and discovery. The patent No. 452,898, dated May 26, 1891, embraced smashing and tableting machines; but that patent is out of the case, there being no attempt by the complainants to show by proof that that patent had been infringed as distinguished from patent No. 204,741. The whole controversy in this case, therefore, is based upon the alleged infringement of patent No. 204,741.

The defendant Busch, by his answer, denied that the complainant Jones was the first and original inventor or discoverer of the device or process described in patent No. 204,741; he also denied that he had in any manner infringed any patent right owned by the plaintiffs, or either of them, or that he had derived profit or gains from any such alleged infringement. He denied, on information and belief, that said Jones was the first, original and true inventor of the improvements or process set forth in the patent and claimed therein; and he also denied that the alleged improvements and process were new or useful, or that the same had not been known and used by others prior

to the alleged invention thereof by said Jones, or that the same had not been patented or described in any printed publication prior to his alleged invention thereof; and he further denied that the alleged improvements or process had not been in public use or on sale for more than two years prior to his application for letters patent therefor. The defendant alleges that patent No. 204,741 is void, because it required no invention to produce the alleged improvements therein claimed, and that the alleged improvements described in said patent are not patentable inventions within the meaning of the patent laws. But if such alleged improvements were patentable under the law, still the defendant insists, that the patent is void, for that the alleged inventions, and the same principles and combinations, and every substantial and material part thereof, shown, described and claimed therein as new, were, prior to the date of the application for said patent, and the date of said alleged inventions by said Jones, shown, described and set forth in certain publications and patents specifically mentioned and referred to in the answer. The defendant says that the press he is using is a patented one, but differs radically in construction and mode of operation from the alleged invention shown, described and claimed by the plaintiff Jones. The defendant denies the right of the complainants to any injunction on the allegations of the bill.

Replication was entered, and the parties proceeded to take evidence; and a considerable volume of evidence was produced, consisting largely of expert testimony; that is to say, the testimony of witnesses skilled in and familiar with the art to which the subject matter of the patent relates. The cause came on to hearing, and the court below, by an interlocutory decree of the 11th of February, 1896, declared and decreed that the patent No. 204,741, granted to Jones for bookbinder's drypress and sheet-tie was good and valid in law; that Jones was the original and first inventor of the improvement and process described and claimed in the

patent; that the W. O. Hickok Manufacturing Company was the sole and exclusive licensee under the patent; and that the defendant had infringed said letters patent and the exclusive rights of the complainants thereunder, and particularly the patent right embraced in and covered by the first, second and fourth claims of said patent, and also by practicing the process embodying the improvement specified and particularly claimed in the fifth claim of said letters patent.

It was also adjudged and decreed that the plaintiffs should recover from the defendant the profits, gains and advantages which said defendant had received or made, or which had arisen and accrued to him by reason of any infringement of said patent rights since the date of said patent, and also the damages which the plaintiffs had sustained by reason of such infringement, to be assessed according to law. And for the purpose of taking such account of the gains, profits and advantages, and of ascertaining the damages proper to be assessed, the case was referred to the auditor of the court, with directions to state the account and report the same to the court; and it was also ordered and decreed that a perpetual injunction be issued as prayed in the bill.

The claims in the patent that were, by the preceding decree, adjudged and determined to have been infringed by the defendant, were the following:

" 1. In a printer's and book-binder's dry-press and sheet-tie, the compressing-heads C D D' and $B^2$ F' F, constructed with cross-ways $L^2$ $L^2$, centrally arranged through them, substantially as and for the purposes herein set forth.

" 2. The inclined press-bed H $H^2$, provided with longitudinal slots $H^1$ $H^1$ in its sides, in combination with the press-heads $B^2$ F' F and C D D', having through them the cross-ways $L^2$ $L^2$, correspondingly arranged with said slots, substantially as and for the purpose set forth.

" 4. In combination with the dry-press bed H $H^2$, the

device of a set of removable ledges, *f*, or a set of adjustable guide-rods, *m*, arranged as and for the purpose set forth."

These three claims have reference to the structure and arrangement of the press machine. The following claim is descriptive of the process by which the drypressing is effected, without the use of fuller boards:

" 5. The process herein described for treating folded printed sheets of paper in drypressing, the same consisting of subjecting a collection of such sheets to pressure without the use of fuller boards, and while under such pressure tying them into compact bundles with end boards, then removing them immediately from the press, and allowing them to remain tied sufficiently long to fix and complete drypressing."

Under the reference made by the decree, the auditor examined all the facts of the case, and made a full and clear report of his findings from the facts, and stated an account accordingly. He ascertained the amount due the plaintiffs from the defendant to be $3,491.70, with interest from the 26th day of March, 1897, the date of filing the report and account in court. To this account thus stated the defendant excepted upon various grounds, but the exceptions were all overruled by the court, and the report and account were ratified and confirmed. And afterwards, that is to say, on the 4th day of April, 1899, the court passed a final decree, whereby it was adjudged and decreed, that the previous interlocutory decree of February 11, 1896, under which the account was stated, should be confirmed and made final, and that the defendant should pay to the plaintiff the amount ascertained by the auditor, with costs. It is from this latter decree that the appellant has appealed.

*Mr. George J. Murray* and *Mr. Charles E. Riordan* for the appellant.

*Mr. M. W. Jacobs* for the appellee.

Mr. Chief Justice Alvey delivered the opinion of the Court:

In support of his appeal the appellant has assigned eight errors.   These alleged errors are the following, stating them in the order in which they have been assigned:

(1) That the court below as a court of equity had no jurisdiction to take cognizance of the case, because there was complete remedy at law; and even if the bill of complaint did show ground for the exercise of jurisdiction, because an injunction was prayed, yet, as no steps were taken to procure an injunction during the life of the patent, the remedy at law was adequate, and the court, as a court of equity, should not have proceeded with the cause.

(2) That the patent in suit, so far as the fifth claim is concerned, is void, because even if the alleged process was new, it is apparent that it was the mere function of the machine that was claimed.

(3) That the patent is void for want of novelty, by reason of anticipation by the patents set up in evidence, and by reason of public and common use, not only of the combinations covered by claims 1, 2 and 4, but also by reason of the process practiced on the Palmer press years before the application for the patent by Jones.

(4) That the patent is void for want of invention, so far as the fifth claim is concerned, because the process had been used prior to the application by Jones for patent, without the use of any machine to assist in carrying out the process.

(5) That the claim 4 of the patent is void for ambiguity.

(6) That the single machine used by the defendant, in view of the state of the art preceding the Jones invention, did not infringe either of the claims 1, 2 and 4.

(7) That the court should, on the motion of the defendant, have vacated the interlocutory decree, after the auditor had made his report, showing that there were no damages to be assessed.

(8) And finally, that the court erred in overruling the exceptions to the auditor's report and account, and in adopting the principles upon which the account was stated.·

It is quite apparent that several of these assignments of error are but different modes of stating substantially the same proposition, and will not, therefore, require separate and distinct consideration.

1. The question of jurisdiction raised by the appellant we can hardly regard, in view of the repeated decisions of the Supreme Court of the United States upon the subject, as being open for discussion upon the facts alleged and shown in proof in this case. If it were true that the suit had been begun so recently before the expiration of the patent that, under the rules and practice of the court, no injunction could have been obtained before such expiration, the bill should have been dismissed for want of equity jurisdiction. But the bill in this case was filed on the 10th of March, 1894, and the patent did not expire until the 11th of June, 1895, about fifteen months after suit brought. The pleadings had been made up, and the plaintiff's *prima facie* proof taken by September 24, 1894, and the further delay in the taking of the proof seems to have been at the instance of the defendant. Under such circumstances, the jurisdiction of the court had attached, with ample time for its exercise; and at most it was a discretionary matter with the court below, whether the bill should be retained and the cause be proceeded with, notwithstanding the expiration of the patent on the 11th of June, 1895, or to dismiss the bill and turn the parties over to their action at law. The court exercised its discretion in favor of retaining the bill and proceeding to take the account; and this court, being in the exercise of appellate jurisdiction, will not review the mere discretionary determination of the court below of such question, unless it were shown that the exercise of the discretion was in a manner clearly illegal.

That has not been shown in this case.  *Clark* v. *Wooster*, 119 U. S. 322, 325.

In the case just referred to, of *Clark* v. *Wooster*, it was said by the court, speaking by Mr. Justice Bradley: "The jurisdiction had attached, and although, after it attached, the principal ground for issuing an injunction may have ceased to exist by the expiration of the patent, yet there might be other grounds for the writ arising from the possession by the defendants of folding guides illegally made or procured whilst the patent was in force.  The general allegations of the bill were sufficiently comprehensive to meet such a case.  But even without that, if the case was one for equitable relief when the suit was instituted, the mere fact that the ground for such relief expired by the expiration of the patent, would not take away the jurisdiction and preclude the court from proceeding to grant the incidental relief which belongs to cases of that sort.  This has often been done in patent causes, and a large number of cases may be cited to that effect; and there is nothing in the decision of *Root* v. *Railway Co.*, 105 U. S. 189, to the contrary."  Other cases are cited to the same effect.  "It is true that where a party alleges equitable ground for relief, and the allegations are not sustained, as where a bill is founded on an allegation of fraud, which is not maintained by proofs, the bill will be dismissed *in toto*, both as to the relief sought against the alleged fraud and that which is sought as incident thereto."

In that case it was held that, although there were only three days for the patent to run, it was within the discretion of the court to take jurisdiction; and having done so, without enjoining the defendant, it was competent for it to proceed to grant other incidental relief sought by the bill.

And so in the case of *Beedle* v. *Bennet*, 122 U. S. 71, it was held, that if a bill be filed in equity to restrain an infringement, and be filed before the expiration of the patent, the jurisdiction of the court is not defeated by the

expiration of the patent by lapse of time before the final decree. In that case the court said that, "As the patent was in force at the time the bill was filed, and the complainants were entitled to preliminary injunction at that time, the jurisdiction of the court is not defeated by the expiration of the patent by lapse of time before final decree." But it is clear that if the bill upon its face, or the evidence produced, gives rise to the fair presumption that the suit was instituted in equity merely to evade an action at law, the bill will not be entertained. *Root* v. *Railroad Co.*, 105 U. S. 189, 211. For it is now a well settled principle that a bill in equity for a naked account of profits and damages against an infringement of a patent can not be maintained; that such relief ordinarily is incidental to some other equity, the right to enforce which secures to the patentee his standing in court, and that the most general ground for equitable interposition is that which tends to insure to the patentee the enjoyment of his specific right by injunction against a continuance of the infringement. 105 U. S. 215, 216.

It is contended, however, that the court below was without equity jurisdiction to take cognizance of the case, because it is shown that the defendant was not a manufacturer of the invented article, but a mere user of the single machine, and that damages could be easily measured by the difference between the cost and the selling price of that machine, without reference to a master to take an account; and therefore the remedy at law was adequate and complete. But this contention can not be supported. It was not the press only, but the process also, covered by claim 5, used, it is true, in connection with the machine, that were being used by the defendant in alleged violation of the rights of the plaintiffs under the patent; and it was the right of the plaintiffs to have such user restrained, down to the time when the patent expired.

In the case of *Mills Mfg. Co.* v. *Whitehurst*, 56 Fed. Rep. 589, 594, where a similar defense was set up and relied on

by an infringer, the court, in disposing of the defendant's contention, said: "The second defense, that the complainant has an adequate remedy at law, and therefore is not entitled to sue in equity, must be overruled. . . . The defendants are users, not manufacturers, but, if infringers, they may be enjoined; and that disposes of the objection to the jurisdiction." And the same principle is laid down as clear law, by the Supreme Court of the United States, in the case of *Birdsell* v. *Shaliol*, 112 U. S. 485, 487.

We discover no want of jurisdiction in a court of equity to entertain the bill in this case, and to administer the relief therein prayed.

2. The next contention is, that the patent, as to claim 5 therein, such claim being for process only, is simply void, because it is for the mere *function* of the machine, and therefore not patentable. This contention presents an important question, and the defendant relies, in support of his contention, upon certain decisions of the Supreme Court of the United States, and especially the decisions made in the recent cases of *Risdon Locomotive Works* v. *Medart*, 158 U. S. 68, and *Westinghouse* v. *Boyden Power Brake Co.*, 170 U. S. 537. In these cases there is some general phraseology used in the opinions of the court, which, if considered in a general broad sense, might be taken to give some color to the contention of the defendant. But we do not think that, upon consideration of the entire opinions in those cases, any such proposition was intended to be decided by the court as that contended for in this case. This is manifest, we think, from what was said by the court in the case of *Westinghouse* v. *Boyden Co.* After referring to the previous cases in which the subject has been considered, the court said: "These cases assume, although they do not expressly decide, that a process to be patentable must involve a chemical or other similar elemental action, and it may be still regarded as an open question whether the

16 Ct. App.—4

patentability of processes extends beyond this class of inventions.    Where the process is simply the function or operative effect of a machine, the above cases are conclusive against its patentability; but where it is one which, though ordinarily and most successfully performed by machinery, may also be performed by simple manipulation, such, for instance, as the folding of paper in a peculiar way for the manufacture of paper bags, or a new method of weaving a hammock; there are cases to the effect that such a process is patentable, though none of the powers of nature be invoked to aid in producing the result."    And the court, after citing several cases in support of the. proposition stated, proceeds to say: "This case, however, does not call for an expression of an opinion upon this point, nor even upon the question whether the function of admitting air directly from the train-pipe to the brake cylinder be patentable or not; since there is no claim made for an independent process in this patent and the whole theory of the specification and claim is based upon the novelty of the mechanism."

Now, it is quite clear, we think, that the operation described in claim 5 of the patent under consideration requires the effective force of a mechanical structure, and though the result produced be the effect of a process, used in connection with the machine, yet that result can only be produced by the combination of machine force and a skillful manipulation of the material to be operated upon, according to the process, aided by the co-operation of the principles of natural law.    There is no chemical action involved, it is true, but there is an elemental action, that of tight cohesion under a high degree of pressure, effected by a special mechanical contrivance; and to produce new and beneficial results by such means or process would seem to be clearly within the reason and contemplation of the patent laws.

This question would seem to be settled by express decision. In the case of *Cochrane* v. *Deener*, 94 U. S. 780, a case of infringement, and where the question of the patentability

of a mechanical process was presented, Mr. Justice Bradley, delivering the opinion of the court, said: " That a process may be patentable, irrespective of the particular form of the instrumentalities used, can not be disputed. If one of the steps of a process be that a certain substance is to be reduced to a powder, it may not be at all material what instrument or machinery is used to effect that object—whether a hammer, a pestle and mortar, or a mill. Either may be pointed out; but if the patent is not confined to that particular tool or machine, the use of the others would be an infringement, the general process being the same. A process is a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject matter to be transformed and reduced to a different state or thing. If new and useful, it is just as patentable as is a piece of machinery. In the language of the patent law, it is an art. The machinery pointed out as suitable to perform the process may or may not be new or patentable; whilst the process itself may be altogether new, and produce an entirely new result. The process requires that certain things should be done with certain substances, and in a certain order; but the tools to be used in doing this may be of a secondary consequence."

In the case of *Tilghman* v. *Procter*, 102 U. S. 707, it was held that a valid patent may be granted for applying and carrying a well known principle into practical useful effect by means of a mechanical contrivance and apparatus. And in the celebrated and much considered *Telephone Cases*, 126 U. S. 1, 532, the question of the patentability of a process was discussed and the principle stated with great fullness and clearness by the late Chief Justice Waite. In the course of his elaborate opinion, he said :

" In this art, or, what is the same thing under the patent law, this process, this way of transmitting speech, electricity, one of the forces of nature, is employed ; but electricity left to itself will not do what is wanted. The art consists in so

controlling the force as to make it accomplish the purpose. It had long been believed that if the vibrations of air caused by the voice in speaking could be reproduced at a distance by means of electricity, the speech itself could be reproduced and understood. How to do it was the question." And after stating that Bell had devised a way in which the necessary changes of intensity could be made and speech actually transmitted, the Chief Justice proceeded to say: " In doing this, both discovery and invention, in the popular sense of those terms, were involved; discovery in finding the art, and invention in devising the means of making it useful. For such discoveries and such inventions the law has given the discoverer and inventor the right to a patent— as discoverer, for the useful art, process, method of doing a thing, he has found; and as inventor, for the means he has devised to make his discovery one of actual value." And he then proceeds to declare that an art—a process—which is useful, is as much the subject of a patent, as a machine, manufacture, or composition of matter; and that of this there can be no doubt; and he refers to the previous cases upon the subject.

Without referring to other authority, it is clear, we think, upon the authorities to which we have referred, that the claim 5 in the patent under consideration is not merely, as contended by the defendant, a claim for the function of a machine, but is for a process, in the operation of which a machine is used as one of the essential means to produce the desired result. That result being new and useful, it was the proper subject for a patent.

3 and 4. The third and fourth errors assigned, relate to the question of the want of novelty, by reason of the alleged anticipation by prior patents, and of public and common use of the combination covered by claims 1, 2 and 4, and also by reason of the practice of the process, covered by claim 5, with the knowledge of Jones, the patentee, years before the application by Jones for his patent on the Palmer press.

Before referring to the evidence in the case, it may be proper to state the general principles or presumptions that arise upon the grant of the patent alleged to have been infringed; and upon whom, in such case as this, the burden of proof rests.

It is a general principle that a patent is *prima facie* evidence of its own validity, and that it was regularly issued; and the burden of proving the want of novelty in the invention covered by it is on the party seeking to establish that fact. *Singer Mfg. Co.* v. *Brill*, 7 U. S. App. 601. Consequently, the want of novelty in the invention is matter of defense, unless it appears on the face of the patent that the device is without novelty or invention. *Fruit Packing Co.* v. *Cassidy*, 7 U. S. App. 424. Therefore when the Patent Office grants a patent for a device which accomplishes the same result as a prior patent, though according to a different method or process, the latter patent is to be taken as evidence of a determination by the office that the latter invention is of value and does not conflict with or infringe the prior patent; and this presumption will be indulged until overcome by satisfactory evidence to the contrary. *Packard* v. *Lacing Stud Co.*, 33 U. S. App. 306; *Boyden* v. *Power Brake Co.*, 25 U. S. App. 475.

The witnesses examined in the case have very fully and clearly explained the operation of the press, embodying claims 1, 2 and 4, and the manner of manipulating, arranging, and compacting the printed sheets of paper, preparatory for the binder described in claim 5; and have shown wherein these several claims were for valuable and substantial improvements upon all former devices known and used in the art of bookbinding; especially intended for drypressing the printed sheets, and effacing therefrom the impressions produced by printing. The state of the art prior to and at the date of the patent in question, is stated by Mr. Jones himself, the patentee, who was examined as a witness. He is a skilled bookbinder and printer, of large

and varied experience in the art, and he describes the former process of preparing the printed sheets for the binder, thus:

"The sheets were taken, after being printed, and dried. The drying was done by laying them over a peel and hung up on poles near the ceiling of the room. They were then taken to a table and laid out flat, averaging from one to six sheets, and were laid between fuller or glazed boards alternately. They were then laid into a large screw press in bunches about an inch and a half or two inches in thickness, and then a cherry board was placed on them, and so on alternately until the press was filled, when a force of hands, consisting of eight or ten persons, would apply the pressure by means of a long iron lever. The sheets were then allowed to remain in the press over night, and the press was emptied the next morning in the same manner that it had been filled, that is, the sheets and fuller or glazed boards were piled up on a table and the operators proceeded to take out the flat pressed sheets, laying them to one side the pile and laying the boards off on another pile. This was all done before the folding of the sheets." In answer to another interrogatory, he says: "The fuller boards, probably more commonly known in the trade as glazed boards, they being a board about the thickness of a heavy card board, and made of some very hard fibre, and being a hard board with a finished surface, they act as a hard substance placed between two rough, soft, yielding substances, and the sheets being placed from one to six between said boards, it gives a comparatively solid surface interposed between the yielding surface of the sheets, whereby by using pressure and allowing that pressure to remain continuously on the sheets and boards while in press from twelve to twenty-four hours, it smooths out the indentations or impressions made by the printing on the sheets." The pressure referred to could be produced either by screw power worked by hand, or by a hydraulic press.

A full statement of the operation of drypressing under

the Jones patent is given by Mr. Robertson, examined as an expert witness on the part of the complainants. He is a patent solicitor and mechanical expert, with practical knowledge of printing and bookbinding. In describing and explaining the invention of Jones, covered by the patent in question, this witness says: "The invention described in said patent and illustrated in the drawings, and covered by the claims referred to in the question, is a process for treating folded printed sheets, whereby the impressions made in the letter-press printing process are flattened out, so that the paper will resume its original smoothness, or substantially so, which process is carried out in such a manner that the operator can be continually putting in the signatures or printed matter and removing them in tied up bundles, whereby with one press a much larger number of signatures can be pressed and at a very much reduced cost for labor over that of the process previously employed. The improvement also consists in a means for carrying out this process, which means is shown in the drawings and more particularly in that part which is shown to the left hand of Fig. 1 and details in Fig. 3 and 4. Previous to the invention of Mr. Jones as described in said patent it was the custom to press printed sheets by inserting them between heavy paper boards, sometimes called 'fuller boards,' but generally now called 'glazed boards,' and putting said boards with the printed papers between them into a powerful press, by which pressure was produced on said boards by various means, sometimes by means of screw pressure, sometimes by hydraulic pressure. After the pressure was produced on the paper it was continued by allowing the press to remain with its pressure on to its fullest extent for ten or twelve hours or more, say from one night to the next morning, when the pressure was removed, the papers and boards taken from the press and separated by removing the boards from the pile of combined boards and paper, and putting the boards on one side on one pile and making

another pile of the printed papers. This was necessarily comparatively a slow process, inasmuch as with one press only as much printed paper as the press would hold when put between the boards could be pressed in about ten or twelve hours, so that where much work had to be done a number of such presses were necessary. It was also costly as to labor, because the sheets had to be placed between the boards and removed therefrom afterwards, which took much time, especially where, as in the case of fine work, only one sheet was placed between two boards; and when this was done comparatively few sheets could be pressed at once, because the boards took up much more room than the paper did, they being quite thick.

"By the process set forth in this patent the printed sheets are not allowed to remain in the press for any considerable length of time, but only long enough for the operator to tie up the bundles, when they are immediately removed, the entire process of putting the paper into the press, tying it up in the bundle and removing it therefrom taking but a few minutes. . . . A large number of bundles may be pressed and tied up in the course of a day, and left tied up between the boards with the pressure upon them as long as is thought necessary to smooth out the impressions produced by the printing press, or until the signatures may be wanted by the binder to complete the operation of making the book for which the signatures are printed. The printed paper or signatures are thus allowed to remain for a considerable time tied up in bundles, which time may be from twenty-four hours to three or four days, and may extend to a year or more, the longer the better, as it is upon the time in which the bundles remain tied up subject to pressure between the boards that the smoothness of the printed papers depends, the mere pressure produced by the press in the short time the paper remains in it having comparatively little effect upon the impression produced by the printing press. The pressure of the press and the mere tying up would produce

but little effect if the signatures were immediately untied as soon as they were removed from the press; and the long continued pressure after the bundle has left the press is therefore an essential part of the process, and without which it would not be much of a success."

This witness proceeds at great length, and with fullness and particularity, to show the operation and the value of the Jones patent, over and as compared with the pre-existing methods of accomplishing the objects of the patent; and he shows that the process and method of operation under the Jones patent is not only better than the prior method of drypressing, but is a novel and valuable improvement in the art. The testimony of this witness is amply supported by the testimony of the expert witnesses, Grier, De Vinne, Nicholson, Penicks, and Sugdam, all witnesses of high and unquestioned qualification, well acquainted with the former state of the art of bookbinding, and the appliances used, and quite familiar with the value and decided improvement in the art effected by the patent issued to Jones.

The defendant not only sought to throw doubt upon the question of the novelty of the invention of Jones, and thus to defeat the claims of his patent, but attempted to show, even conceding his invention, that neither of the claims in the patent was patentable, and that there was a want of substantial improvement upon the old or former methods or process of drypressing in the art of bookbinding. But the testimony to which we have already referred would seem to be ample to refute this contention on the part of the defendant.

The witness who testifies in support of this contention of the defendant is Mr. Hood. He is a patent solicitor, but neither a bookbinder nor a printer, and only has such knowledge of those arts as he has gathered in a general way by observation and reading. He, however, expresses a very decided opinion against the novelty, usefulness and patentability of Jones' inventions covered by the patent No. 204,741.

But no other of the expert witnesses examined in the cause expresses any such opinion. Indeed, Mr. Hood himself, in attempting to analyze the several claims of the patent, and to describe the scope and operation of them, does not very materially differ from the other expert witnesses, though he does materially differ from them as to the conclusion at which he arrives.

There is nothing in the evidence that is sufficient to support the third and fourth assignments of error by the defendant.

5 and 6. Under the fifth assignment of error it is urged that claim 4 of the patent is void because of ambiguity; and under the sixth assignment of error it is contended that the single machine used by the defendant, in view of the preceding state of the art, did not infringe either of the claims 1, 2 and 4.

We perceive no such ambiguity in claim 4 as to require it to be declared void for that cause. The purpose of that claim, as stated by Mr. Hood, is to provide for the combination with the pressbed of two alternative forms of guides for centering the sheets in the press. Or, as stated by expert Robertson, the two parts designated in the claims are substantially equivalent to each other, and either can be used for the purpose of supporting the signatures with equal facility.

As to the question of infringement, the testimony in the case leaves no doubt on that subject. The infringement was of the construction of the press under claims 1, 2 and 4, and in the use of the process described in claim 5. The testimony of Jones, the patentee, and of several other witnesses clearly establish the fact of infringement. And though the press operated by the defendant was manufactured by and purchased from the Seybold Company of manufacturers, and he purchased and operated only a single press, still, if that press or machine was so constructed as to embrace and to be operated upon the essential principles of the press or machine covered by the

patent issued to Jones, notwithstanding some change in the location, arrangement and management of parts, there was an infringement for which the party operating the machine would be responsible. Mere superficial dissimilarity in construction, which is most that is shown, or that can be contended for in this case, will not protect against infringement; but the difference must be substantial rather than formal. *Sessions* v. *Romadka,* 145 U. S. 29; *National Cash Register Co.* v. *Boston Cash Indicator and Record Co.,* 156 U. S. 502; *Western Elec. Co.* v. *Sperry Elec. Co.,* 18 U. S. App. 177. In this case, the proof is clear that the machine or press used by the defendant, obtained from the Seybold Manufacturing Company, was substantially the same as that secured by the patent to Jones, and therefore such use was an infringement of that patent; and the defendant is responsible for that use, as an infringer, from the time that the press was commenced to be used or operated by him to the time it was destroyed by fire.

7. In the view we have of this case, the seventh error assigned becomes immaterial, and we make no further reference thereto.

8. The only other question remaining for consideration is that relating to the measure of damages, gains and profits, and the principle upon which damages, gains and profits, in such case as the present, should be ascertained and assessed.

The auditor, in his report, states that he did not find in the cause evidence sufficient to enable him to assess damagss to the complainant by reason of the infringement. But he has stated an account of gains, profits and advantages derived by the defendant from the use of the machine and process, from September, 1893, to the 10th of February, 1895, when the press or machine was destroyed by fire. During all the time of the use of the machine and process, the defendant was the public printer for the State of Pennsylvania, and it was in the performance of the work of

such public printer that the machine and process were used. The auditor ascertained and reported that the defendant had realized advantages in the use of the machine and process, as savings in the cost of labor, the sum of $2,782.50, and as savings in waste of paper the sum of $709.20; making a total saving of $3,491.70, which he reported as the gains and profits that accrued to the defendant.

The method of ascertainment adopted by the auditor to reach the result reported by him is supposed to be in accordance with settled authority, and especially the decision of the Supreme Court in *Tilghman* v. *Procter*, 125 U. S. 136. In that case it was held, that upon a bill in equity for infringing a patent, if the defendant has gained an advantage by using the plaintiff's invention, that advantage, whether by way of gains or savings, is the measure of the profits to be accounted for, even if from other causes the business in which the invention was employed by the defendant did not result in profits; and if the use of a patented process produced a definite saving in the cost of manufacture, he must account to the patentee for the amount so saved. And in the case of *McCreary* v. *Penna. Canal Co.*, 141 U. S. 459, it was held, that in a suit in equity for an infringement, in estimating the profits the defendant had made by the use of the plaintiff's invention, where the device was a mere improvement upon what was known before and was open to the defendant to use, the plaintiff was limited to such profits as had arisen from the use of the improvement over what the defendant might have made by the use of that or any other device without the use of the plaintiff's invention. These two cases, it would seem, furnished the auditor with the principles upon which he proceeded in stating the account in this case.

It is certainly true that there is great difficulty in arriving at precise accuracy in stating an account of the savings, gains and profits in such case as the present. But where the master or auditor has fully examined and collated the

facts of the case, and made careful deductions therefrom, as would seem to have been done in this case, and the court below, upon hearing, has ratified and confirmed the finding and account of the auditor, the reasonable presumption is that the conclusion reached is just and proper, and an appellate court will not be disposed to disturb that conclusion, unless the evidence clearly requires it to be done. In this case we do not perceive wherein any injustice has been done the defendant by the findings and conclusions of the auditor. The allowance of interest on the amount of the assessment from the time of bringing in the report and account was manifestly right. And upon a full review of the whole case, our opinion is that the decree appealed from must be affirmed ; and it is so ordered.    *Decree affirmed.*

A motion for reargument, made on behalf of the appellant, was overruled, and an appeal allowed to the Supreme Court of the United States.