BUFFALO FORGE CO. v. CITY OF BUFFALO (THOMAS & SMITH, Inc., Intervener).

(District Court, W. D. New York. July 10, 1917.)

No. 158–B.

1. PATENTS ☞7—VALIDITY—METHOD.
    A patent for a method cannot be sustained, when it appears that the result achieved is due to the operation of a machine; but when the new result comes from certain acts, or a series of steps, irrespective of mechanism or the mechanical assemblage, then the steps taken, or the acts performed, or the mode of treatment, involve patentable invention.

2. PATENTS ☞175—CLAIMS—CONSTRUCTION.
    Where a patentee's invention for humidifying air was a departure from prior processes, the claims of his patent are entitled to a fairly reasonable construction, which will not permit another, by changes of form only, to appropriate the substance of his invention.

3. PATENTS ☞328—INVENTION—INFRINGEMENT.
    The Carrier patent, No. 854,270, for a method of heating and humidifying air, consisting in causing an intimate contact of the air with water heated to a temperature above that of the air and below the boiling point, and automatically regulating the temperature of the water by a thermostatic device, held to show invention and to be infringed.

4. PATENTS ☞328—VALIDITY—ANTICIPATION.
    Carrier patent, No. 854,270, for a method for heating and humidifying air, held not to have been anticipated.

In Equity. Suit by the Buffalo Forge Company against the City of Buffalo, in which Thomas & Smith, Incorporated, intervened. Decree for plaintiff.

Wilhelm & Parker, of Buffalo, N. Y. (Arthur E. Parsons, of Syracuse, N. Y., of counsel), for plaintiff.

William N. Cromwell, of Chicago, Ill., and William Macomber, of Buffalo, N. Y. (Frederick C. Rupp, of Buffalo, N. Y., and John Taylor Booz, and Cromwell, Greist & Warden, all of Chicago, Ill., of counsel), for defendants.

HAZEL, District Judge. Plaintiff brings this action in equity for injunction and accounting, alleging infringement of patent No. 854,270, granted to Willis H. Carrier, May 21, 1907, for a method of heating and humidifying air. The invention relates to a process for supplying fresh air of a definite absolute humidity to the interior of buildings, so as to keep the temperature and humidity within prescribed limits, regardless of external atmospheric conditions within limits "and without the use of direct radiation, by introducing into the air water at properly regulated temperature below the boiling point."

The claims relied upon are the first, third, fifth, sixth, and seventh, reading as follows:

"1. The herein described method of humidifying air, consisting in causing an intimate contact of the air with water heated to a temperature above that of the air and below the boiling point, and automatically regulating the temperature of the water to maintain a practically constant temperature of the air, substantially as set forth."

"3. The herein described method of heating and humidifying air, consisting in causing an intimate contact of the air with water heated to a temperature above that of the air and below the boiling point, and automatically varying the temperature of the water to maintain a practically constant temperature of the air by means controlled by the temperature of the air, substantially as set forth."

"5. The herein described method of regulating the absolute humidity of air, consisting of spraying into the air water heated to a temperature above that of the air and below the boiling point, separating the free water from the air and regulating the temperature of the water by means controlled by the temperature of the humidified air, substantially as set forth.

"6. The herein described method of regulating the absolute humidity of air, consisting in spraying into the air water heated to a temperature above that of the air and below the boiling point, separating the free water from the air and regulating the temperature of the water by a thermostatic device influenced by the humidified air, substantially as set forth.

"7. The herein described method of regulating the relative humidity of air, consisting of saturating the air with vapor by causing an intimate contact of the air with water heated to a temperature above that of the air and below the boiling point, regulating the temperature of the water by a thermostatic device influenced by the humidified air, and then changing the temperature of the air, substantially as set forth."

The principal features of the first claim, which is broad, are automatic regulation of the temperature of the water to maintain a constancy of temperature of the air, and intimate contact of the air with water heated above the boiling point. Claim 3 particularizes the steps for varying the temperature of the water, and means controlled by the temperature of the air. Claim 5 refers specifically to regulating the absolute humidity, spraying heated water into the air at a temperature higher than the air and below the boiling point, separat-

ing the free water from the air, and regulating the temperature of the water by means controlled by the temperature of the humidified air. Claim 6 is substantially the same as claim 5, including, however, a thermostat controlled by the temperature of the humidified air for regulating the temperature of the water; while claim 7 refers specifically to regulating the relative humidity of the air by vaporal saturization, a thermostatic regulation of the water influenced by the humidified air, and to changing the temperature of the air. The apparatus for practicing the process consists of a heater or tank having a number of pipes connected to a steam system, to cause steam to circulate through the pipes in a closed tank, a fan blower, a thermostat K located in the heater or chamber, where it comes under the influence of the warmed and humidified air, a spray nozzle, and other detailed instrumentalities.

[1] The defenses are mainly noninfringement and invalidity; the latter defense being predicated upon the assertion that the claims in issue set forth a purely mechanical process, the function of the apparatus. It is settled law that a patent for a method cannot be sustained when it appears that the result achieved is due to the operation of a machine; but when the new result comes from certain acts, or a series of steps, irrespective of mechanism or the mechanical assemblage of parts, then the steps taken, or the acts performed, or the mode of treatment, involve patentable invention. Cochrane v. Deener, 94 U. S. 780, 24 L. Ed. 139. In such circumstances the resultant, if new and useful, would be as patentable as a mechanical combination, inasmuch as the means, acts, or steps performed in order are generally classified in the patent law as an art; the implements, machinery, or apparatus by which the process is actually performed being inconsequential. Indeed, in successfully performing a process it is often necessary to use mechanical contrivances as auxiliaries, and in such cases the protection of the patent laws will not be denied to an inventor, unless his accomplishment was solely due to mechanical adaptation or to the function of the machine. Risdon Locomotive Works v. Medart, 158 U. S. 68, 15 Sup. Ct. 745, 39 L. Ed. 899.

In a later case (Expanded Metal Co. v. Bradford, 214 U. S. 366, 29 Sup. Ct. 652, 53 L. Ed. 1034), the United States Supreme Court, reaffirming former decisions relating to process patents, stated substantially that a process involving mechanical operations may nevertheless be valid, if a new result is produced "independently of particular mechanism for performing it." Accordingly, the first question here is whether the result produced by the patent in suit is solely due to the apparatus described in the specification. Plaintiff's expert witness, Prof. Carpenter, expressed the view that in performing the process certain chemical changes were made in the air treated, but patentability is not asserted upon that ground alone; greater reliance apparently being placed on the evidence showing that notwithstanding the use of an old apparatus, or material parts thereof, the method or process including their use was novel in the specified treatment of humidity and temperature of the air. This aspect of the evidence is believed not without merit.

[2-4] The patent in question is, I think, valid, irrespective of any automatic regulation of the temperature and humidity of the air by the aid of a thermostat or other mechanical instrumentality, inasmuch as the process was not entirely dependent upon the use of a thermostat; the performance of its function being due to the use of water at a temperature higher than that of the air and below the boiling point, which was first caused to contact intimately with a current of air into which the heated water was sprayed. Such steps increased the temperature of the air, which then vaporized or assimilated the moisture; the relative humidity of the air depending upon the temperature of the air. The thermostat was arranged to come within the influence of the heated and humidified air, and while in that condition operated to maintain the water at a proper temperature to increase the temperature of the air to the point of saturation, or to what is known as dew point, meaning a degree of temperature having a certain amount of humidity below which it cannot be reduced without first condensing the moisture content from the air.

In explanation of this Prof. Carpenter testified:

"The air comes in contact with a series of water sprays; the water being introduced at a regulating temperature, so as to maintain a constant temperature saturation just previous to the point of discharge to the apparatus. The point of saturation is such a point as, corresponding to the temperature, the air holds all the water that it can possibly carry, which is a definite amount for each temperature; and if the temperature is maintained automatically at a certain regulated or predetermined condition, and the vapor of water is introduced in sufficient amount, we have the conditions favorable for producing saturation. Now, normally the air exists in contact with some water vapor, but not sufficient for saturation. Usually the percentage of saturation is from 20 to 40 or 50 per cent. for outside air; 20 per cent. being a very dry condition, and 60 per cent. rather higher than the average, occasionally running up to even higher percentages. Now, when the moisture is spoken of as constituting a certain percentage, then we refer to its condition for sustaining or holding moisture, and we call that its relative condition to any apparatus which we have, so far as the steps of the process set forth in claim 1 is concerned; it ends up with nearly this saturated condition."

The intimate contact of the air with the water is brought about by the action of a pump, which draws the warm water after circulation through the apparatus into a well, the warm water then flowing through a by-pass piping for regulation by the thermostat placed in the room in which the humidity is to be controlled.

Plaintiff claims, and the evidence fairly supports the claim, that Carrier, the patentee, was the first to conceive that air saturated at a definite temperature contains only a certain percentage of moisture per cubic foot, and in such condition of saturation is usable for keeping and controlling humidity.

The prior art discloses a number of apparatuses for keeping temperature and humidifying air; the patents to Carrier, No. 808,897, Cramer, No. 821,989, Bradford, No. 222,234, and to Cramer, No. 813,083, for example, being good specimens. But they are not anticipatory, I believe, as they operated upon a different principle from that of the Carrier patent under consideration. They were operable in each instance in response to variations in humidity and to changes in temperature. Nor do they disclose a control of the dew point or tem-

perature of saturation, and they are consequently unresponsive to fluctuations in temperature. The involved patent made a patentable departure in this respect by inventing means for controlling the humidity of air for heating and ventilating by the utilization of moisture in the air at its saturation temperature; such means depending upon two steps for performance, to wit, the production of a desired relative humidity by saturation of the air "with an amount of vapor sufficient to give the desired absolute humidity to the air when raised to the temperature at which it is to be utilized," and thermostatic regulation of the water controlled in turn by the temperature of the saturated air which was raised or lowered to secure the relative humidity desired. The desired relative humidity at a predetermined temperature was obtained, according to the proofs, by the initial production of absolute humidity of the air, and afterwards changing the temperature of the air as specified in claim 7, this producing a meritoriously different result from prior processes, which I think were limited to humidity regulation only.

It is proven that the patentee herein ascertained by experimentation that by saturation control and by performance of said steps in combination he could attain new and beneficial results, to wit, the regulation of humidity; the device employed being located away from the compartment to which the air was transmitted, by transmitting air to separate compartments and varying the same at the option of the occupants in respect to humidity, while antecedent patents show simply a regulation of a hygrostatic character, depending entirely upon modifications in humidity, as distinguished from modifications in temperature.

But defendants contend that the prior Carrier patent, No. 808,897, differs only in the use of the thermostat, the heater, pumps, pipes, and valves, and that it operated in practically the same way in relation to washing the air of impurities as the patent under consideration, and that the added features—the means for heating and humidifying the air—were old, being disclosed in the prior patents to Bradford and Cramer. I find, however, that the earlier Carrier construction, not only failed to disclose the control of humidity of the patent in suit, but was also without means for altering the temperature of the air; and to include therein a regulating device of hygrometer or dry bulb thermometer characteristics, controllable by relative humidity changes only, would not have resulted in changes of the temperature of saturation or dew point, as in complainant's patent. Prof. Carpenter expressed the expert opinion that Carrier's thermostatic arrangement determining a saturated condition related to a different principle from prior apparatus—

"because in that structure, instead of taking the air in the room as we find it, using an instrument which is sensitive to moisture conditions of the air in the room and having that instrument turn on or off moisture, we produce a constant new condition as to the moisture in so far as the room itself is concerned, any external air which is passing through such apparatus as that inclosed in the casing, and maintained at such a degree of temperature by means of an automatic or temperature regulating device that such temperature air, after being properly mixed and saturated, when transferred into the room

where it is to be used, will have any desired relative humidity; that is, it will be 50 per cent. or 60 per cent. of the total moisture that the air in the room had contained."

The Cramer patent, No. 821,989, was for a device located in a room for discharging moistened air into it. It had no automatic regulation or control, nor does the patentee claim that he obtained a definite humidity. Therefore such patent is not anticipatory. Indeed, none of the prior disclosures suggests means for regulating humidity in which the air was first saturated at a definite temperature, or in which a definite dew point was utilized for accomplishing the result, or wherein a thermostat or equivalent instrumentality indicated temperature changes. The patentee having suceeded in controlling humidity in apparatus of the kind described in his patent, and having made, I think, a departure from prior processes in this relation, his involved claims are entitled to a fairly reasonable construction, and one that will not permit another, by changes of form only, to appropriate the substance of his invention.

The defendants contend that their process was essentially different from complainant's, in that the water in their apparatus was not "heated to a temperature above that of the air and below the boiling point," to which they say the Carrier patent in suit, if valid, must be limited. The witness Thomas, who designed defendants' apparatus, testified that the water in the overhead trough in the heater above the spray chamber was at all times kept at the boiling point or over; that the water injected into the air is ordinarily at the minimum boiling point; that the humidity control was chiefly due to regulating the volume, and not the temperature, of the water coming in contact with the air treatment. His testimony on this point, however, is not assented to by several witnesses for plaintiff, who corroborated the latter's contention of similarity of function and operation. With regard to the installation at Masten Park High School, it is fairly shown that when the air enters the spray chamber it comes in contact with the first two rows of spray; the moisture then being absorbed by the air, owing to the high temperature at which it comes into the apparatus.

Thomas also testified that the heating coils in defendants' apparatus impart from 55° to 70° of heat to the incoming air thus allowing the air to absorb a large volume of water; but I do not think that the water, when contacting the air, is at the minimum boiling point. The assertion that the water in defendants' apparatus is uniformly of a fixed degree, boiling, or nearly so, is not sufficiently corroborated. It was testified in contradiction of this view that a plate attached to the defendants' device bears the inscription, "The air leaving the tempering coils should be regulated at a temperature not exceeding 52° F., minimum 43° F.;" and it also appears that the air leaving all the tempering coils was tested, showing a temperature of from 40° to 45°. Long, engineer at the Masten Park High School, testified that he generally kept the air leaving the coils at a temperature between 40° and 45°, and that the water coming through the sprays was not boiling; while Smith testified that on one occasion he put his hand

in the water in the tank and ascertained that it was not at the boiling point.

Defendants' apparatus (Exhibit 3) I find discloses means for intimately mixing a current of air with water heated to a temperature above that of the air and below the boiling point by spraying the water, and includes a thermostat located so as to be influenced by the heated and humidified air regulating the temperature of the water to maintain a proper temperature of the air; that is, to raise the temperature of the air to a point of saturation, so as to secure absolute humidity. The defendants utilize a pump for mixing the air with the heated water taken from the tank, and then discharge it through nozzled pipes into the air; also a pipe extending to the open tank or heater, and connecting with other pipes for the circulation of steam. While such apparatus is a little different from plaintiff's, which is provided with a closed heater containing the steam pipes, yet the resultant operation is the same. Exhibit 5 shows a similar apparatus installed in the Technical High School, having a similar arrangement of instrumentalities for performing the acts and steps specified in the Carrier patent in suit for heating and humidifying air and accomplishing the same result.

As to prior use: Several witnesses testified that the defendant Thomas & Smith, Incorporated, in the year 1901 installed an apparatus at the Chicago Edison Building not unlike the invention in suit; but, as such testimony as to the appearance of the apparatus and details of construction depends mainly upon their recollection, I am disinclined to credit it completely. Drawings or sketches were introduced indicating its character; but they were made from memory 15 years after the installation, and their probity is rightly challenged. Moreover, the descriptions of such prior use structure with reference to a thermostat, claimed to have been used for regulating temperature and humidity, and its location, were at variance with the description in the bill of particulars filed by defendants under order of the court, and as the location was material in determining identity, the testimony relating thereto falls short of establishing its presence and location beyond a reasonable doubt.

A decree may be entered, with costs, holding the claims in suit valid and infringed by the defendant.