BURT et al.   v.   BILOFSKY et al.

Civ. No. 6529.

United States District Court
Third Dist. New Jersey.

April 27, 1954.

---

3. Pope v. Huth, 14 Cal. 404.

Morris Kirschstein, New York City, Harry B. Rook, Newark, N. J., for plaintiffs.

Mock & Blum, New York City, for defendants.

SMITH, District Judge.

This action, which arises under the patent laws, was commenced under the Declaratory Judgments Act, 28 U.S.C.A. § 400, now 28 U.S.C.A. § 2201. The plaintiffs, having been previously charged with infringement of the patent in suit, filed a complaint in which they challenged the validity of the patent and denied infringement. The defendants filed a counterclaim in which they charged the plaintiffs with infringement and sought the usual relief. The issues are those common to actions under the patent laws.

The defendant Maxwell M. Bilofsky is the owner of the patent in suit, No. 2,-341,520, which was granted on February 15, 1944 on the application of one Maynard A. Babb. The defendant Industrial Electronics Corporation is an exclusive licensee thereunder. The plaintiffs are, and have been, engaged in the manufacture and sale of fluorescent lamp starters. These devices are used in starter circuits, which allegedly infringe the patent in suit. The present action is essentially one for contributory infringement.

The patent in suit relates generally to the starter circuit employed in the operation of fluorescent lamps but covers. particularly, an improvement thereon. The primary object of the invention, according to the specifications of the patent, was to overcome certain disadvantages found in earlier circuits. The purported invention can be more easily appreciated if examined in the light of the art to which it pertains.

### State of the Art

The fluorescent lamp now in common use is a gaseous discharge lamp of the hot cathode type. It comprises a cylindrical tube, the inner surface of which is suitably coated, and a filamentary electrode at either end and disposed within the tube. The tube is charged with an ionizable vapor of low conductivity, to wit, mercury vapor to which is added argon, neon or helium. The electrode consists of a coiled tungsten filament, coated with barium oxide, the ends of which are connected to contact pins which extend beyond the sealed ends of the tube. When the lamp is placed in a suitable fixture

the contact pins are engaged and thus complete both the lamp and starter circuits.

The fluorescent lamp, because of the low conductivity of the vapor, must be started; it will operate on ordinary line voltage only after the vapor is rendered electrically conductive by ionization. The ionization of the vapor is immediately initiated by the emanation of electrons, which occurs when the electrodes are heated to incandescence. The vapor is completely ionized and thus rendered electrically conductive by a discharge of high potential, i. e., a surge of high voltage applied to the two electrodes. The discharge strikes an arc, a flow of electric current, between two electrodes. The flow of current, initiated in the manner described, can be maintained on the ordinary line voltage.

An automatic interrupter disposed in the starter circuit, as distinguished from the lamp circuit, in conjunction with an inductance coil disposed in the lamp circuit, is, and was prior to the patent in suit, utilized as a starter. The interrupter is concededly nothing more than a conventional thermal switch or magnetic switch. The combination operates as follows: When the circuits are energized the interrupter alternately opens and closes, and upon each interruption of the starter circuit the inductance coil releases a high inductive potential, i. e., a surge of high voltage, which is imparted to the electrodes. The voltage is sufficient to strike the arc necessary to the complete ionization of the vapor in the lamp. When the lamp is started the interrupter remains open and the starter circuit is thus locked out.

It was known prior to the patent in suit, and in fact prior to the earlier patent to Gref, infra, that there were certain disadvantages intrinsic in the earlier starters. These disadvantages gave rise to certain problems, which are adequately described in each of the said patents. The inventions of the respective patents had for their object the solution of these problems.

## Patent in Suit

Claims 3, 4, 5, 7 and 9 of the patent in suit cover a circuit for "gaseous electric discharge devices commonly embodied in hot cathode gaseous lamps" such as "fluorescent lamps of that type." The invention is defined in claim 5, which is typical, as follows: "In a safety starting and operating circuit for vapor electric discharge devices equipped with spaced electrodes, means effective to establish a series connection through said electrodes, means to interrupt and maintain interrupted said connection when the arc of the lamp is struck and as long as it is maintained, a normally open by-pass line connected with a difference of potential between its terminals, a temperature responsive switch subjected to the heat evolved in the starting circuit due to starting current and arranged to interrupt said series connection under the excess heat generated in the attempted starting of a defective lamp and to close circuit through said by-pass line, said by-pass line having circuit characteristics such as to pass sufficient current to keep the temperature responsive switch in deflected position."

The invention as thus defined comprises the following elements: (a) A fluorescent lamp of the type hereinabove described; (b) a conventional thermal interrupter, such as a glow switch, disposed in the starter circuit, in conjunction with an inductance coil disposed in the lamp circuit; (c) a thermal switch of the bimetallic type, in conjunction with a suitable resistance coil, disposed in the starter circuit and in spaced relation to the contact point of a normally open by-pass circuit; and (d) a normally open by-pass circuit in conjunction with a resistance coil disposed in the circuit. When closed, the latter circuit functions in the manner hereinafter described. Elements (a), (b) and (c) were in common use and had been employed in starter circuits for fluorescent lamps prior to the patent in suit. Devices strikingly similar to element (d) were in common use and had been employed in other types of circuits.

We have heretofore described the normal function and operation of element (b), a conventional thermal interrupter. The essence of the invention is primarily in elements (c) and (d), and we therefore direct our attention to their function and operation in the circuit of the patent in suit.

Elements (c) and (d) perform no useful function under normal conditions; the combination is generally regarded as a safety device. When the fluorescent lamp fails because of some defect or electrical disturbance the glow switch operates automatically, a disadvantage intrinsic in the earlier starters; it operates continually in the absence of some means to open the starter circuit. The thermal switch, element (c), is such a means. The continual operation of the glow switch quickly generates heat in the resistance coil and this heat is imparted to the bimetallic blade or disk; the blade or disk, which is normally responsive to heat, is deflected and thus starter circuit is opened. The blade or disk returns to its normal position when cooled in the absence of means to hold it in a deflected position. The by-pass circuit, element (d), is such a means. The deflected blade or disk makes contact with the by-pass circuit and is thereafter held in deflected position by the heat imparted by the resistance coil disposed therein. It should be obvious that upon deflection of the blade or disk the starter circuit is opened and the auxiliary circuit is closed. The devices reset automatically when either the defective lamp is replaced or the circuit is de-energized.

### Prior Art References

The Spaeth patent, 1,881,975, granted in 1932, relates to a starter "for mercury arc lamps and similar apparatus." Lamps of this type differ in principle from the fluorescent lamp, but like the fluorescent lamp they are started by a discharge of high potential, i. e., a surge of high voltage. The discharge of high potential is released by an inductance coil upon the operation of an interrupter disposed in a starter circuit.

The invention of Spaeth comprises the following elements: (a) a starter circuit; (b) a conventional interrupter of the mercury-magnetic type disposed in the starter circuit; and (c) a thermal switch of the bimetallic type, in conjunction with a resistance coil, disposed in the starter circuit and in spaced relation to the interrupter. The thermal switch, normally responsive to the heat imparted by the resistance coil, opens the starter circuit upon deflection of the bimetallic blade. The blade will remain in a deflected position and the starter circuit will remain open while the line is energized. This expedient prevents the further operation of the interrupter and renders the starter circuit inoperative while the line is energized.

The Spaeth patent, 1,881,976, granted in 1932, likewise relates to a starter "for mercury arc lamps and similar apparatus." The invention of this patent comprises: (a) a starter circuit; (b) a conventional interrupter of the mercury-magnetic type disposed in the starter circuit; (c) a normally open by-pass circuit; and (d) a mercury-magnetic switch disposed in the by-pass circuit. The normally open by-pass circuit is closed automatically by the second switch and thus holds the starter circuit open as long as the by-pass circuit is energized. This expedient prevents the further operation of the interrupter and renders the starter circuit inoperative while the line is energized.

The relevancy of the first reference is in its disclosure of a thermal switch of the bimetallic type, in conjunction with a resistance coil, as a means to lock out the starter circuit after it has performed its function. The relevancy of the second reference is in its disclosure of a mercury-magnetic switch, in conjunction with a by-pass circuit as a means to lock out the starter circuit after it has performed its function. It is clear that either device will perform the same function, to wit, prevent the operation of the starter while the line is energized.

The Erdman patent, 1,983,605, granted in 1934, also relates to a starter "for

mercury arc lamps and similar apparatus." The second claim of this patent defines the invention as follows: "In a lighting circuit, a lamp, a power source therefor, a switch for said power source, a starting device for said lamp, and mechanical time control means for rendering said starting device inoperative after the expiration of a short time interval from the closing of the switch of the power source, *said mechanical time control means being operated by a coil connected in parallel with said power source and maintaining said starting device inoperative while said switch from said power source is closed,* whether said lamp is operating or not operating, *said starting device being again operable only upon the disconnection and reconnection of the lamp* with said source of power." (Emphasis by the Court).

The invention of this patent appears to be a slight improvement on the invention of Spaeth, 1,881,976. The invention comprises: (a) a conventional starter circuit; (b) a conventional interrupter disposed in the starter circuit; (c) a normally open by-pass line or circuit; (d) a conventional switch, preferably of the mercury type, disposed in the normally open by-pass circuit. The usual inductance and resistance coils necessary to the operation of the switches are appropriately disposed in the circuit. The interrupter, element (b), and the switch, element (d), operate automatically and successively; the operation of the switch closes the by-pass circuit and simultaneously opens the starter circuit, thus rendering the interrupter inoperative. The relevancy of the reference is in its disclosure of this expedient.

The Lea patent, 1,701,757, granted in 1929, relates to a safety device automatically operable to protect "electric circuits." The invention, according to the specifications of the patent, "is of especial utility in connection with electric systems such as are employed in motor vehicles," but it is not so limited. The specifications describe several variants, but we confine our discussion to one which is particularly relevant.

The variant is defined in claim 5 as follows: "In means for protecting an electric circuit, the combination with a conductor of said circuit of a circuit-interrupting device therefor constructed and arranged to move normally toward circuit-closing position, heating responsive means adapted to cause movement of said device to interrupt said circuit upon the occurrence of excessive flow therein, and *means tending to oppose return of said device to circuit-closing position during the continuance of the abnormal condition* tending to cause such excessive flow." (Emphasis by the Court). A similar variant is disclosed in claim 3, which differs from claim 5 in descriptive language.

The inventions defined in claims 3 and 5, as described in the specifications, comprise the following: (a) a conventional thermal switch of the bimetallic type, in conjunction with a suitable resistance coil, disposed in the main line; (b) a normally open by-pass circuit, the open contact of which is in spaced relation to the thermal switch; (c) an additional resistance coil which is energized when the by-pass circuit is closed in the manner hereinafter described.

An abnormal condition, such as a short circuit in the line quickly generates heat in the first resistance coil and this heat is imparted to the bimetallic blade; the blade is thereby deflected and thus the main circuit is opened. The deflected blade strikes the open contact of the by-pass circuit and automatically closes this circuit. When the by-pass circuit is energized, upon closure, the heat generated by the additional resistance coil is sufficient to maintain the bimetallic blade in deflected position. The automatic operation of the thermal switch opens the main circuit and closes the by-pass circuit; the former will remain open and the latter will remain closed until the line is de-energized.

The Dench patent, 2,200,443, granted in 1940, relates generally to an improvement on the earlier gaseous discharge lamp circuits, and particularly to the thermal switch of the bimetallic type

therein described, hereinabove referred to as the glow switch. The claims of this patent cover several variants.

The invention is defined and the essential functions of its elements are described in claim 5, which is typical, as follows: "The combination of a gaseous electric discharge lamp provided with electrodes therein adapted to be heated to an electron emitting temperature from a source of electrical energy and having a filling of a readily ionizable medium, a source of electrical energy for energizing said lamp, an *inductance element connected to said source and to said lamp, and an automatically responsive device operable to connect said electrodes in a series circuit with each other and with said source for heating said electrodes* to an electron emitting temperature and *for thereafter interrupting said series circuit for said electrodes to cause the initiation of a discharge therebetween,* said device comprising a container provided with an ionizable medium therein and a pair of electrodes *one of which is a bimetallic element and between which a discharge occurs upon the application of a potential from said source,* and contacts carried by the electrodes of said device and connected to the electrodes of said lamp and operable to engage each other upon said bimetallic element being heated by the discharge to close said series circuit and *for interrupting said circuit upon cooling of said bimetallic electrode to cause an attendant voltage surge from said inductance element* for initiating a discharge in said lamp." (Emphasis by the Court).

The Gref patent, 2,293,897, granted in 1942, relates generally to fluorescent lamp circuits, and particularly "to the combination in which a resettable automatically operable switch is included in the starter means." The invention of this patent is an improvement on the invention of Dench, although not so designated in the patent. The "automatically operable switch" is essentially a safety device, a feature not present in the invention of Dench.

The inventions of this patent, as defined in claims 1, 2 and 3 thereof, comprise the following elements: (a) a fluorescent lamp of the type hereinabove described; (b) a conventional thermal interrupter, such as a glow switch, disposed in the starter circuit, in conjunction with an inductance coil disposed in the lamp circuit; (c) a thermal switch of the bimetallic type, in conjunction with a suitable resistance coil, disposed in the starter circuit; (d) a resilient blade secured at one end and held in deflected position by a detent mounted on the free end of the bimetallic blade of the thermal switch; and (e) a manually operated reset button mounted on the resilient blade. The free ends of the bimetallic blade and the resilient blade are so arranged in relation to each other that upon the deflection of the former, in response to the heat of the resistance coil, the latter is released opening the starter circuit.

The essence of the Gref invention, the only improvement on the invention of Dench, is in elements (c), (d) and (e). This combination functions as a safety device. When the fluorescent lamp fails because of some defect or electrical disturbance the glow switch operates automatically, a disadvantage recognized by Gref. The object of the combination was to overcome this disadvantage and its consequences.

The device operates as follows: The continual operation of the glow switch, caused by an abnormal condition, quickly generates heat in the resistance coil and this heat is imparted to the bimetallic blade; the blade, which is normally responsive to heat, is deflected and thus the starter circuit is opened. The deflection of the bimetallic blade automatically releases the resilient blade, which is thereafter held in open position by its own resiliency until reset. The starter circuit remains open and inoperative even though the bimetallic blade returns to its normal position when cool. After the abnormal condition has been corrected the device is reset manually.

The invention and its operation are described in the specifications as follows:

"While the switch may take many forms, in the preferred form of the invention it comprises a heat-responsive switch having one of the contacts normally urged into open-circuit position, but held in closed-circuit position by a heat-responsive detent or the like. The movable member of the switch is provided with a button or manual operator which is normally disposed within the housing, but, upon operation of the switch to open circuit, projects beyond the housing. This not only provides a manual actuator for resetting the switch, but also an indicator for signalling that the circuit has been opened at the starter switch."

## Validity

■ The claims in issue cover nothing more than an assemblage of known elements, and must therefore be appraised in the light of the prior art considered in its entirety. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L. Ed. 162; Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58; Saranac Automatic Machine Co. v. Wirebounds Patents Co., 282 U.S. 704, 51 S.Ct. 232, 75 L. Ed. 634. The claims must be scrutinized with a "care proportioned to the *difficulty* and *improbability* of finding invention" in such an assemblage. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra [340 U.S. 147, 71 S.Ct. 130.]

The elements of the purported invention, and particularly elements (a), (b) and (c), had been disclosed by Gref, who had utilized them in a fluorescent lamp circuit in which they perform the same function in substantially the same manner. The claim to patentable invention here rests solely on the utilization of an auxiliary circuit, element (d), to maintain the thermal switch, element (c), and concomitantly the starter circuit, in open position. Similar circuits had been disclosed by Spaeth, Erdman and Lea, who had utilized them in the manner hereinabove described. It seems rather obvious that except for this feature, to wit,

the auxiliary circuit, the claims in issue read on claims 1, 2 and 3 of the Gref patent.

■ The question presented for determination is whether or not the patentee's improvement on the invention of Gref, viewed in the light of the disclosures of Spaeth, Erdman and Lea, was such an advance over the prior art as will support the claim to patentable invention. We think not. The substitution of an electrically operated lock-out device for the mechanically operated lock-out device, disclosed and utilized by Gref, required nothing more than the expected ingenuity of a skilled mechanic. We are firmly convinced that the conception, considered in the light of the earlier disclosures, required nothing more than a knowledge of the art and the mechanical skill of a qualified artisan.

■ The purported invention of the respective claims in issue comprises nothing more than an assemblage of old elements in a circuit in which these elements perform no new or different function. It is well established that such assemblages are patentable "only when the whole in some way exceeds the sum of its parts". Great Atlantic & Pacific Tea Co. v. Supermarket Corp., Cuno Engineering Corp. v. Automatic Devices Corp., both supra; Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008; Altoona Publix Theaters v. American Tri-Ergon Corp., 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005; General Motors Corp. v. Estate Stove Co., 6 Cir., 201 F. 2d 645; Packwood v. Briggs & Stratton Corp., 3 Cir., 195 F.2d 971; Hutchinson Mfg. Co. v. Mayrath, 10 Cir., 192 F.2d 110; Park-In-Theaters v. Perkins, 9 Cir., 190 F.2d 137. The purported invention of the respective claims does not meet this rigid test of patentability, and the claims are therefore invalid because of the lack of patentable invention over the prior art. Ibid.

■ We are of the opinion that the patent in suit is in the category of those condemned by the Supreme Court, which,

in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra, stated, 340 U.S. at pages 152, 153, 71 S. Ct. at page 130: "The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly." This statement is apposite in the instant case.

The patent in suit was heretofore held invalid by the United States Court of Appeals for the Second Circuit, Bilofsky v. Westinghouse Electric Supply Co., 160 F.2d 154. The pertinent observations of the Court, appearing on pages 156 and 157 of 160 F.2d are worthy of repetition.

"It is clear enough that Babb was the first to add to Gref's automatically opened starting circuit a device for holding it open which would be released automatically when, and only when, closure was desired. It is also apparent that this had some useful features not found in the latch-holding means of Gref since it eliminated the need for going to the lamp until a new tube was to be inserted. But so much alone is less than enough to support the patent. What is disclosed must, to be patentable, be new in the sense that Babb was the first to accomplish that result in substantially the way he did it. (Citations omitted.)

"While Babb was the first to use in the starting system of a fluorescent lamp an additional by-pass circuit which was normally open and would be closed and held closed electrically so long, and only so long as desired, he was not the first to do that very thing in the field of discharge lamp starting systems to which his contribution to the art belongs. * *

Though complete anticipation of Babb was not shown, his improvement of Gref's control by installing the slight adaptation of Spaeth's automatic re-set as a substitute for Gref's manual one in the way described was not the substantial step beyond the prior art which is invention that will support a valid patent."

It appears that the United States Court of Appeals for the Second Circuit relied solely on the patents to Dench, Gref, and Spaeth 1,881,976. We are of the opinion that the other references hereinabove cited are equally relevant; in fact, in our study and consideration of the Spaeth patents, supra, we were more impressed by the disclosures of 1,881,975. If we accord to this patent of Spaeth a range of equivalents comparable to that here asserted by the defendants in support of their claim for infringement, the patent to Spaeth might be held to be anticipatory.

### Method Claims

Claims 1 and 2 of the patent in suit purportedly cover a "method." We are firmly convinced that these claims do not define a patentable method but define the peculiar and characteristic functions of the elements embodied in the circuit defined in the other claims and appropriately illustrated and described in the specifications of the patent. These claims are therefore void. Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136; Risdon Iron & Locomotive Works v. Medart, 158 U.S. 68, 15 S.Ct. 745, 39 L.Ed. 899; Miller v. Zaharias, 7 Cir., 168 F.2d 1; Swan Carburetor Co. v. Chrysler Corporation, 6 Cir., 130 F.2d 391; Thordarson Electric Mfg. Co. v. General Transformer Corporation, 7 Cir., 93 F.2d 36; Detroit Gasket & Mfg. Co. v. Fitzgerald Mfg. Co., 2 Cir., 89 F.2d 178; Black-Clawson Co. v. Centrifugal Engineering & Patents Corp., 6 Cir., 83 F.2d 116; Continental Can Co. v. Cameron Can Machinery Co., 7 Cir., 76 F.2d 173; Interstate Folding Box Co. v. Empire Box Corporation, 7 Cir., 68 F.2d 500; Chisholm-Ryder Co. v. Buck, 4 Cir., 65 F.2d 735. Any fur-

ther discussion of these claims would unnecessarily prolong this opinion.

## Patent Act of 1952

The defendants contend that Sections 102 and 103 of the Patent Act of 1952, 35 U.S.C.A. provide a new test of patentability insofar as the issue of patentability in the instant case is concerned. This contention is without merit. General Motors Corp. v. Estate Stove Co., 8 Cir., 203 F.2d 912; certiorari denied 346 U.S. 822, 74 S.Ct. 37.

## Issue of Infringement

The issue of infringement can be decided only upon an assumption that the patent in suit is valid. We are of the opinion that the patent in suit is so clearly invalid that such an assumption would be difficult, if not impossible. There is, however, an additional answer to the charge of infringement.

The accused device is a starter which may be employed in the conventional starter circuit hereinabove described. It comprises the following elements: (a) a conventional thermal interrupter of the glow switch type disposed in the starter circuit; (b) a thermal switch of the bimetallic type, in conjunction with a suitable low resistance coil, disposed in the starter circuit; and (c) a lock out unit which consists of a high resistance coil connected across the line of the starter circuit and in spaced relation to the bimetallic blade of a thermal switch. The heat of the high resistance coil is sufficient to hold the bimetallic blade in a deflected position. This expedient was disclosed by Spaeth, patent 1,881,975 who utilized it in a circuit in which it performed the same function in substantially the same manner. The accused starter is constructed in accordance with the teachings of the prior art, to wit, Dench, Gref and Spaeth; it is nothing more than a combination of elements disclosed in the prior art. It follows that the accused starter cannot be held to infringe.

## Conclusions

I. The claims in issue are invalid for the reasons herein stated.

II. The accused starter does not infringe the claims in issue for the reasons herein stated.

NOTE: The facts herein recited and the conclusions of law herein expressed shall be considered the findings of fact and conclusions of law required by Rule 52 of the Federal Rule of Civil Procedure, 28 U.S.C.A.